Filed 3/7/23  Marriage of Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JOSELIN CRUZ VALADEZ and JOSEPH OLIVER GONZALEZ. | |
| JOSELIN CRUZ VALADEZ GONZALEZ,    Appellant,        v. JOSEPH OLIVER GONZALEZ,    Respondent. | G060832 (Super. Ct. No. 19D002540) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Maurice Sanchez, Judge.  Reversed and remanded with directions.  Request for judicial notice. Granted.

Community Legal Aid SoCal, Katelyn Rowe, Terra Castillo Laughton, Michael Waldren, Sarah Reisman; O'Melveney & Myers, Brett J. Williamson and Thomas M. Harris for Appellant.

Family Violence Appellate Project, Arati Vasan, Jennafer D. Wagner, Shuray Ghorishi; Barnes & Thornburg and Amy C. Poyer, as Amicus Curiae on behalf of Appellant.

The Draheim Law Firm and Jennifer E. Draheim for Respondent.

\*　　　\*　　　\*

Joselin Cruz Valadez Gonzalez appeals from an order denying her request for a domestic violence restraining order (DVRO) against Joseph Oliver Gonzalez, from whom she is physically separated and in the process of dissolving their marriage.[1] After the trial court denied the DVRO request, Joselin appealed. She argues the court erred in concluding she did not show a past act or acts of abuse because she presented undisputed evidence that Joseph violated a temporary restraining order (TRO) that previously was entered enjoining him from contacting her except for visitation-related issues. As discussed below, we conclude Joselin has made a prima facie case for relief. We reverse and remand for the court to exercise its discretion to determine whether to issue a DVRO based on the TRO violations.

I

FACTUAL AND PROCEDURAL BACKGROUND

On October 30, 2018, the parties were engaged in an altercation resulting in Joseph's arrest and being charged with spousal battery and disturbing the peace.[2] As part of Joseph's criminal case, the court issued a criminal protective order (CPO) on November 6, 2018. Among other things, the CPO prohibited Joseph from having any "personal, electronic, telephonic, or written contact" with Joselin, except through an

---

[1] As the parties share the same last name, we refer to them by their first names for sake of clarity. No disrespect is intended.

[2] We grant appellant's request for judicial notice of the "Case Summary" and "Case Detail" of Joseph's criminal case.

attorney of record. On March 28, 2019, Joselin filed a petition for dissolution of the parties' marriage. Subsequently, in July 2019, the criminal court modified the CPO to permit Joseph to have "peaceful contact" with Joselin "only for the safe exchange of children and court-ordered visitation."

On August 16, 2019, Joselin filed a DVRO request, seeking personal-conduct orders and a stay-away order. The requested personal-conduct orders sought to enjoin Joseph from harassing Joselin and from contacting her, although there was an exception for "[b]rief & peaceful contact with regards to the kids." In a supporting declaration, Joselin stated the basis for the DVRO request was the October 30, 2018, incident, during which she alleged Joseph "pushed [her] and hit [her] on the arm . . . threatened [to] do[ ] things to [her]," and "punch[ed the] wall and thr[e]w objects that were in his proximity." Joselin also alleged that Joseph kept "firearms and knives in the closet," and "he was always worked up and anxious." She stated she was afraid he would hurt her and the kids. Finally, Joselin explained she was filing the DVRO request because she found out that the CPO could be dismissed depending on the outcome of the criminal case.

The same day, the trial court granted the requested personal-conduct orders and stay-away order as a TRO until a hearing, which was scheduled for September 6, 2019. Specifically, the TRO prohibited Joseph from "[c]ontact, either directly or indirectly, in any way, including but not limited to, by telephone, mail, e-mail, or other electronic means," except for "[b]rief [and] peaceful contact with regards to the kids." After the parties stipulated to Joselin having sole legal and physical custody and a visitation schedule for Joseph, on September 6, 2019, the TRO was modified to permit "[b]rief and peaceful contact" with Joselin and "peaceful contact with [the] children . . . as required for court-ordered visitation of children," and the hearing on the DVRO request was continued to October 17, 2019.

3

Pursuant to the parties' stipulation due to Joseph's pending criminal case, the matter was continued several times until March 18, 2020, and the court ordered all existing orders to remain in full force and effect until the hearing. On March 18, 2020, the court, sua sponte, continued the matter and extended the TRO to May 27, 2020, "[d]ue to emergency court closure" because of COVID-19. On May 27, 2020, the court extended the TRO and the hearing date to July 7, 2020, "[p]ursuant to California Judicial Council Emergency Rule 8(b)(2)." Subsequently, the parties stipulated several times to continue the matter due to Joseph's pending criminal case, with the last stipulated date being May 6, 2021, and the court extending all orders until that date.

On May 6, 2021, the court held a hearing on Joselin's request for a DVRO. At the outset, it asked whether the parties had discussed extending the TRO for a year, noting the matter had been pending for almost two years and a DVRO usually is often granted for three years. Joselin's counsel replied that his client was not willing to consider extending the TRO because "[t]here are allegations of violations of the [TRO] so it doesn't make sense to continue out a [TRO] that is simply going to be violated." When counsel suggested Joselin was "not being permitted to proceed [on her DVRO request] or the court deems it, you know, inappropriate for her to proceed," the court interrupted and stated: "Nobody's deeming anything inappropriate. It was simply an offer. She's perfectly able to proceed. Nobody's stopping her or restraining her in any way." Counsel then stated Joselin wanted to proceed, and the hearing began.

Joselin testified she has been married to Joseph since 2017, and they have two minor children. On October 30, 2018, they decided to take the children to her "mother-in-law's for Halloween" when Joseph got upset and started yelling. Joselin took the children back into the house and Joseph followed. Joseph continued yelling, and he hit and kicked the walls and nearby chairs. Joseph tried to take the children, but she stopped him and Joseph left. Less than a minute later he returned and kicked the door until it opened. Joseph grabbed the kids and pushed Joselin out of the way from the door.

4

He also threatened her saying, "Don't make me do something that I will regret." When he made that statement, Joselin recalled that Joseph had some weapons and knives in a closet. She grabbed her cell phone to call for help and Joseph hit her with an open hand on her left arm. Joselin then grabbed the kids and went to one of the bedrooms, locked the bedroom door and called 911. When she called she did not hear Joseph make any further noise. Around 20 minutes later, the police arrived. The police spoke with her, took some firearms and knives from the closet, and arrested Joseph.

Joselin also testified Joseph violated the CPO and the TRO by communicating about things not related to the exchanging of the children on several occasions. Five exhibits documenting these communications were admitted into evidence.[3] Finally, Joselin's counsel asked her if she was "afraid" of Joseph, and she responded she was because "during the whole time we've been together, he loses control easily, and I'm afraid something could happen when he loses control."

On cross-examination, Joselin acknowledged that after the CPO and TRO were in effect, on several occasions she would accompany Joseph and the children on trips to the park and the beach. She also testified that several times when she dropped the children off at her mother-in-law's house, she would stay for dinner and when Joseph arrived, she would remain for 20 to 30 minutes while finishing dinner before leaving.

Joselin's counsel then called Joseph as an adverse witness and questioned him about the text messages he sent Joselin in October and December 2020. Joseph

---

[3] The documents show text communications from Joseph to Joselin on the morning of October 27, 2020; the afternoon of December 18, 2020; the afternoon of December 7, 2002; and the evening of December 28, 2020. On October 27, 2020, Joseph texted Joselin stating he did not deserve to have restrictions on his life based on the criminal case, claiming Joselin used him to gain citizenship and she was mad because he was excited to go alone to see his mom with their children and she thought he had a girlfriend. On December 18, 2020, Joseph texted Joselin, stating he loved her and wanted to be with her and their children for the rest of his life. On December 27, 2020, Joseph texted: "Like really what is wrong with you. How do you feel that anything you have done so far the past 2 years is right or good for our [children] in any way." On December 28, 2020, Joseph texted: "I didn't do anything wrong to you. I married you for you[r] dam[n] citizenship. And you wouldn't even use my last name . . . Joss you need to wake up and see what[']s happening." 18 minutes later, he texted: "I[' m sorry joss I[' m just frustrated and miss our sons. I l[o]ve you still. My emotions hurt."

5

admitted sending them, and in response to counsel's question, explained he sent the text messages to Joselin because "she would contact me, so I felt that it was a mutual conversation."

Joseph then testified on his own behalf. He stated that after the Halloween incident, Joselin started contacting him after he got out of jail and they have been in continuous communication since. During cross-examination, he clarified that Joselin would communicate with him without being prompted.

As to the Halloween incident, Joseph denied hitting Joselin. He explained the argument started when Joselin asked him to go to his mother's house alone with the kids and when he agreed, her facial expression changed and she started bickering. They began arguing about who would take the children until Joselin took the children back into the house. Joseph began driving away when he noticed he had the car seats, so he returned to the house to give Joselin the car seats so she could go alone with the children to his mother's house. When he entered he observed Joselin crying hysterically. He begged her to go with him, but she responded by taking out her cell phone and scanning it. Joseph covered the phone with his hand, but she yanked it back and called the police. Joseph waited outside for about five minutes before the police arrived. Joseph denied slapping Joselin's wrist or hand, punching or kicking any walls or furniture, or throwing any objects.

Joseph testified Joselin never hit him and did not throw anything at him during that incident, but that she had broken plates during prior arguments. He also testified that about two months before the Halloween incident she informed him in passing that victims of domestic violence get expedited citizenship, which he found "very odd" because that issue "wasn't even . . . part of [the] conversation."

Following presentation of the evidence, the court stated it tested the evidence by a preponderance of the evidence standard and carefully considered the credibility of the parties. "Based on the above, the court cannot determine – not conclude

6

that domestic violence occurred. And on this record, the request for a permanent restraining order is denied." The court noted that any party is free to refile based on new allegations and if any new domestic violence occurred "police should promptly be called to keep the peace and protect the victim."

The court then stated: "The court also finds that while some circumstances may have involved [Family Code section] 6203 offending conduct[; n]evertheless, the circumstances seem very situational. It was over almost three years ago – not over, but almost three years ago and it's not likely to reoccur. There appears to be bi-directional conflict. Both parties – there was testimony both parties broke things, raised their voices and were, you know, yelling or raised their voices at each other." The court found that "[t]he parties do not generally appear to be fearful of each other," noting Joselin had testified to having at least "partial dinners" with Joseph present and accompanying Joseph with the children to the beach and the park. The court then reiterated that "[t]he conflict appears to be related to an emotional outburst with poor impulse control. Again, this was Halloween 2018, was the last incident. [¶] And again, there is little to no risk to – that these circumstances will reoccur and the moving party does not entertain a reasonable apprehension of future abusive conduct." It concluded that "based on the totality of all of the circumstances, the issuance of a [DVRO] is not appropriate and, therefore, the request is denied."

II

DISCUSSION

A. *General Principles*

Under the Domestic Violence Prevention Act (DVPA), Family Code section 6200 et seq.,[4] a court may issue a protective order "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved

---

[4] All further statutory references are to the Family Code.

7

in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." Section 6300, subdivision (a) provides: "An order may be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse. The court may issue an order under this part based solely on the affidavit or testimony of the person requesting the restraining order." Section 6301, subdivision, (c) provides: "The length of time since the most recent act of abuse is not, by itself, determinative. The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief."

The DVPA defines "'[a]buse'" as intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in "reasonable apprehension of imminent serious bodily injury to that person or to another," or engaging in any behavior that could be enjoined pursuant to section 6320. (§ 6203, subd. (a).) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Rather, it includes a broad range of harmful behaviors enumerated under section 6320, including threats, stalking, annoying phone calls, direct or indirect contact, and "disturbing the peace of the other party." (§ 6320, subd. (a).)

We review the trial court's denial of a DVRO request for an abuse of discretion. (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.) However, "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the '"legal principles governing the subject of [the] action[.]"'" (*Nakamura v. Parker* (2007)

8

156 Cal.App.4th 327, 337.)  Here, "we consider whether the trial court's exercise of discretion is consistent with the [DVPA's] intended purpose."  (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685.)  "'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law.  [Citation.]  Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.  [Citation.]' [Citation.]  The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation]."  (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

"'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.'"  (*In re Marriage of G.*, *supra*, 11 Cal.App.5th at p. 780.)  "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied.  [Citation.]  Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding."  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)  But where, as here, "the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

9

Here, the trial court denied Joselin's DVRO request on two grounds. First, the court stated it could not conclude based on the evidence presented that any abuse had occurred. Stated differently, it determined Joselin had not made her prima facie case to show "to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).) Second, in the alternative, the court concluded that even if the Halloween incident involved some circumstances that constituted abuse under section 6203, granting a DVRO was not appropriate based on the totality of the circumstances, including the age of the incident, its unlikeness to reoccur, and Joselin's general fear toward Joseph after the incident and reasonable apprehension of future abuse.

Joselin challenges the trial court's denial of her DVRO request under both of the above grounds. She argues she presented a prima facie case because she presented undisputed evidence that Joseph violated the TRO. As to the court's alternative ground for denying the DVRO request, Joselin argues the court erred in exercising its discretion because it considered two impermissible factors: the age of the Halloween incident and her fear of future abuse.

B. *Joselin Made a Prima Facie Case for Relief Based on Joseph's Violations of the TRO*

At the outset, we note Joseph's violations of the TRO were not alleged as a basis for a DVRO in Joselin's filings. Nevertheless, the trial court could and should consider such evidence in determining whether to grant a DVRO request. As a California court has explained: "While a trial court should, of course, hear and evaluate the evidence relating to incidents set forth in a petitioner's request, evidence of postfiling abuse is also relevant, particularly when that abuse occurs after a temporary restraining order has been issued, as was the case here. The purpose of a domestic violence restraining order is not to punish past conduct, but to 'prevent acts of domestic violence [and] abuse' from occurring in the future. (§ 6220.) Evidence of recent abuse or violation of a TRO is plainly relevant to whether a petitioner should be granted a protective order." (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 117.) A categorical refusal

10

to consider postfiling evidence would violate "the DVPA's mandate that a court 'shall' consider the 'totality of the circumstances' in determining whether to issue a restraining order.  [Citations.]"  (*Id.* at p. 118.)

As noted, under the DVPA, "'abuse'" includes "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320."  (§ 6203, subd. (a)(4).) Section 6320 authorizes a court to enjoin a party from "telephoning, including, but not limited to, making annoying telephone calls" and "contacting, either directly or indirectly, by mail or otherwise" a protected person.  The TRO here enjoined Joseph from "contact[ing]" Joselin, "either directly or indirectly, in any way, including but not limited to, by telephone, mail, e-mail or other electronic means."  At the hearing, Joselin presented undisputed evidence that Joseph violated the TRO on several occasions when he directly contacted her about matters not relating to the kids or visitation.  Thus, as a matter of law, Joselin has shown past abuse sufficient to support a DVRO order.  (See *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 603 ["H.'s alleged acts of (1) communicating with N. about issues in excess of those necessary to C.'s custody exchanges . . . would constitute violations of the TRO, and would justify issuance of the DVRO as requested"].)

C.  *Remand Is Appropriate In This Case*

Section 6300, subdivision (a), provides "An order *may* be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Italics added.)  In other words, although a finding of past abuse is a necessary precondition to the issuance of a restraining order, such a finding does not *require* the trial court to issue a restraining order upon request or prescribe minimum conditions for an order, if issued.

Although the record here shows, as part of its alternative ground for denial of the DVRO request, the court exercised its discretion to deny a DVRO based on the Halloween incident, the record does not support a finding that the court exercised its discretion to deny the DVRO request based on the violations of the TRO. Additionally, although Joselin made a prima facie case for relief, we cannot, on the record before us, order the court to enter the DVRO as requested. For example, Joselin never testified Joseph's text messages were annoying, disturbing or threatening. The proper remedy therefore is to remand the matter to the trial court to exercise its discretion for the first time to determine whether issuance of a DVRO would be appropriate in response to Joseph's TRO violations, and if so, the scope of that DVRO.

Because we are reversing the order and remanding the matter, we need not address Joselin's other claims of error. However, we will address one claim to provide guidance to the trial court on what factors it may consider in exercising its discretion to grant or deny the DVRO request. Joselin argues the court cannot consider the age of an abusive incident to deny an initial DVRO request. We disagree. Section 6301, subdivision (c), provides: "The length of time since the most recent act of abuse *is not, by itself, determinative*. The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief." (Italics added.) Although the age of an abusive incident is not determinative on whether to grant or deny a DVRO request, the DVPA does not preclude the court from considering that factor as part of the totality of the circumstances. Thus, the court may, but need not, consider the age of the TRO violations when examining the totality of the circumstances.[5]

---

[5] We appreciate amicus curiae's briefing, but its chief concerns are not implicated here. Specifically, the record shows that any delay in holding a DVRO hearing was the result of the pandemic emergency and the parties' own agreement. Additionally, the trial court expressly stated it was not precluding Joselin from proceeding with the DVRO hearing if she wished. Finally, the TRO that was entered was prepared by Joselin and appears substantially similar, if not identical, to the DVRO being sought.

12

## III

### DISPOSITION

The order denying the request for a DVRO is reversed and the matter remanded for further proceedings.  Appellant to recover costs on appeal.


DELANEY, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.