Filed 9/11/24  Razavi v. Razavi CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MICHELLE RAZAVI,<br><br>    Petitioner and Appellant,<br><br>    v.<br><br>SEYED RAZAVI,<br><br>    Respondent. | B324113<br><br>(Los Angeles County<br>Super. Ct. No.<br>21SMRO00136) |

    APPEAL from an order of the Los Angeles County Superior Court, Joshua D. Wayser, Judge.  Affirmed.

    Michelle Razavi, in pro. per., for Appellant.

    Lozoya & Lozoya and Robin J. Lozoya for Respondent.

_____

    Michelle Razavi appeals from an order denying her request for a domestic violence restraining order (DVRO) against her father, Seyed Razavi.[1]  Michelle contends the family court abused its

_____

[1]    Where the parties have the same surname we refer to them by their first names to avoid confusion.

discretion in denying the DVRO because she submitted substantial evidence of abuse, the court applied an incorrect legal standard, and it improperly excluded evidence showing Seyed's past abuse. Michelle also argues the court violated her due process rights by displaying bias in favor of Seyed's attorneys. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Michelle's Request for a DVRO*

On July 30, 2021 Michelle filed a request for a DVRO against Seyed, seeking to protect Michelle, her mother (Farhad Rahimi),[2] and her brother (Michael Razavi).[3] In the request Michelle stated, "[Seyed] has physically and verbally abused me throughout my entire life. . . . He has sent me endless texts, emails, [and] openly admitted to stalking me online to keep tabs on me. . . . He most recently trespassed into the parking garage of my apartment complex and left an intimidating note signed by him on my car . . . ." The application listed the "date of most recent abuse" as July 29, 2021. The application attached one page of a police report listing dates of occurrence as May 5, 2021 and July 29, 2021 and describing the incident as "unk[nown] susp[ect](s) continued sending multiple emails/text messages from different email accounts and phone numbers to vict[im] after being advised that they were unwelcomed."

---

[2] Rahimi and Seyed's marriage was dissolved in 2001.

[3] On our own motion we augment the record with Michelle's July 30, 2021 request for a DVRO, Michelle's October 20, 2021 application for order for posting of summons, and the exhibits Michelle filed in support of her March 25, 2022 declaration. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

The family court[4] issued a temporary restraining order (TRO) restraining Seyed and protecting Michelle, Rahimi, and Michael, and the court set a hearing on the DVRO for August 24, 2021. Over the subsequent three months, however, Michelle had difficulty serving Seyed with the TRO and notice of the DVRO hearing. On October 20, 2021 Michelle filed an application for order for posting of summons requesting alternative service pursuant to Code of Civil Procedure section 413.30. The application attached a form declaration signed by Michelle on September 16, 2021 stating "see attached declaration of Michelle Razavi" (capitalization omitted). The form declaration attached an undated declaration signed by Michelle (the September 16, 2021 declaration).

The September 16, 2021 declaration provided additional information regarding Seyed's conduct starting in 2004 when Michelle was a teenager. Michelle declared that in 2005 Seyed screamed profanities at Rahimi, in 2008 he ruined Michelle's birthday because Rahimi had to go to court to defend against creditors as a result of Seyed's alleged embezzlement, and while Michelle was in high school Seyed made daily calls to the family home "to check on [Rahimi] and see where she was."

Regarding recent events, Michelle stated that on October 12, 2019 she received an anonymous call saying her mother would be harmed or killed if Michelle appeared as a witness in her parents' divorce proceeding. Then, in May 2021 Seyed sent her an email wishing her happy birthday despite her request not to have contact with him, and on July 26, 2021 Seyed drove by her as she left her place of work. On July 29, 2021 Seyed placed a note from "Dad" on

---

[4]     Judge Susan Lopez-Giss issued the temporary restraining order and presided over the case through the beginning of January 2022.

3

the windshield of her car parked in her apartment complex's gated parking area, even though she had previously asked Seyed to stop contacting her.

On October 20, 2021 the family court granted Michelle's request for alternative service under Family Code section 6340, subdivision (a)(2)(A),[5] authorizing Michelle to serve Seyed by mail and post the summons in the Santa Monica courthouse for 28 days. On December 20, 2021 Seyed appeared at the hearing, and the court found good cause had not been shown to include Rahimi and Michael as protected persons under the TRO.[6] The court continued the hearing on the DVRO.

On January 18, 2022 Seyed filed a response to Michelle's request for a DVRO in which he denied Michelle's allegations. In his supporting declaration, he acknowledged that he sent the May 5, 2021 email to Michelle wishing her a happy birthday. He attached the email, which read: "Hope your birthday is as extraordinary and special as you are, and may you forever sparkle and shine like the star that you are and I wish you a birthday that is as beautiful, incredible, and unique as you are. The last ten years, I can only see you through social media . . . , however what I see makes me proud of you for being happy, healthy, and successful . . . . I wish I get a chance someday to tell you my side of the story . . . . Being my favorite has not been easy on you, however we all have been dealt a hand that we have to play no matter what. Be happy, positive and continue to make me proud." Michelle

---

[5] Further undesignated statutory references are to the Family Code.

[6] After Seyed informed the family court that Rahimi and Michael did not live in Los Angeles County, the court stated, "They will be removed because they should not have been included."

responded, "Don't you ever fucking dare email me at my work ever again. Such a violation of privacy to follow me on Instagram you creep." Seyed stated his email was intended to be a "positive loving birthday email," and Michelle's response caused him pain.

Seyed stated he had not reached out to Michelle in the two years prior to sending the email. Further, he had not contacted Michelle since the May 5, 2021 email, he did not leave any notes on her car, he did not show up at her work, and he did not ask anyone else to contact her. He believed Michelle lived in San Francisco, and he only learned that she had relocated to the Santa Monica area after she requested a DVRO. Seyed denied that he had ever been abusive to Michelle or Rahimi. Seyed and Rahimi were married for 13 years.

Seyed also declared that although his relationship with Michelle had been strained, in 2016 he gave a car to her as a gift. They corresponded by email about the car, and after receiving the gift, Michelle sent a photograph to Seyed of her standing in front of the car.

On January 13, 2022 Seyed filed evidentiary objections to Michelle's September 16, 2021 declaration.[7] Michelle filed a response to Seyed's objections, and at the January 19, 2022 hearing

---

[7] There has been significant confusion on appeal regarding which declaration Seyed objected to in January 2022, much of which has been caused by Seyed's counsel. Seyed's objections stated they were in response to a December 20, 2021 declaration. However, Michelle has adamantly denied filing any declaration on that date, and Seyed's counsel has since acknowledged that date was incorrect. It is clear from our comparison of Michelle's September 16, 2021 declaration and Seyed's January 13, 2022 objections (which quote Michelle's declaration) that Seyed objected to Michelle's September 16 declaration.

5

the family court[8] stated it had ruled on Seyed's evidentiary objections "[a]fter considering the objections and the response." In its January 19 rulings, the court sustained many of Seyed's objections.[9]

B.    *The Hearing on the DVRO Request*

On March 25, 2022, two weeks prior to the continued hearing date, Michelle filed a 10-page declaration with 37 exhibits in support of her request for a DVRO. The declaration contained much of the same information as the September 16, 2021 declaration regarding allegations of abuse by Seyed dating back to 2005. Seyed filed evidentiary objections to the declaration.

At the outset of the pretrial hearing held on April 4, 2022, the family court stated its view that evidence regarding Michelle's childhood and the parents' divorce was not material to whether Seyed disturbed Michelle's peace because "people have a right to say to other people, including their parents, I don't want to see you. And then the question becomes did the father take steps to disturb the daughter's peace." Michelle's attorney argued that he would like to present evidence showing how Seyed's relationship with the family started to "sour" in 2005, Seyed failed to take financial responsibility for Michelle, and when Michelle confronted him, Seyed responded in an extreme and violent manner, causing

[8]    Judge Joshua D. Wayser signed the order and presided over subsequent proceedings in the case.

[9]    Michelle does not specifically address the evidentiary rulings on appeal, and she has therefore forfeited any challenge to the family court's rulings. (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1197; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

6

Michelle to flee the family home. The court declined to consider evidence prior to 2009, emphasizing that it was Michelle's right not to have contact with Seyed, which the court took as a "given," and thus the question at the hearing was how Seyed in response "proceeded and conducted himself and how [Michelle] responded to that."

The court admitted Michelle's September 16, 2021 declaration and Seyed's declaration in response to the request for a TRO, subject to the court's prior evidentiary rulings. The court did not admit Michelle's March 25, 2022 declaration, finding it was duplicative of her September 16, 2021 declaration, and the court therefore did not "need it."

The hearing on Michelle's request for a DVRO took place over four days between April 4 and August 17, 2022. Michelle, Seyed, and the parties' experts testified.

1.     *Michelle's testimony*

Michelle testified that "the past six months have been the most horrific experience of my life." She continued, "And all I am here for today is just to be safe and to sleep at night and not to worry about my safety." She explained that she and Seyed had been estranged since 2009, and she told him she did not want to have any contact with him. In 2016 Seyed contacted Rahimi and offered to purchase a car for Michelle. Michelle initially refused, but she later agreed to accept the gift on the condition that Seyed not contact her or expect a relationship with her. Michelle admitted she sent a photograph of herself with the car to Seyed but claimed she did so only after Rahimi directed her to thank him. Michelle stated, "I sent him the photo, and I thanked him because that was the polite thing to do, but I was very clear in that I did not want any communication. I did not want a relationship."

For several years, Michelle and Seyed had no further contact until Seyed sent her a text message in 2018 regarding her parents' divorce proceeding. Michelle responded by emailing Seyed, with the intent to "clearly communicate to him that I don't want any communication with him." Michelle asserted Seyed ignored her request on October 12, 2019, when he called her from a blocked number and threatened to hurt her and Rahimi if she testified in the divorce proceeding. According to Michelle, Seyed identified himself on the call, and she recognized his voice.

In May 5, 2021 Michelle received an email from Seyed wishing her a happy birthday, which stated that Seyed could only see her "through social media," and what he could see "makes me proud of you for being happy, healthy, and successful." Seyed added that he hoped to "get a chance someday to tell you my side of the story." Michelle testified the email made her feel violated, and she felt Seyed was stalking her online and was "obsessed with" her. She responded to the email with profanity to send Seyed a clear message that she did not want him to contact her.

Michelle's next contact with Seyed was when he "drove past her" on July 26, 2021, while she was leaving her place of work at a fitness center.[10] Michelle explained she taught fitness classes, and her schedule was posted online. Seyed made eye contact with her from his car, then drove away. Michelle stated the incident made her feel "[t]errified, violated, watched; [and] unsafe."

---

[10] Michelle also testified regarding telephone calls her business partner and her business partner's parents received in June 2021. The calls were from a blocked number, but Michelle testified the caller identified herself as Seyed's sister and warned Michelle's business partner that Michelle had stolen money from Seyed. In response to hearsay objections, the family court stated it was not admitting the testimony for its truth.

On July 29, 2021 Michelle found a typewritten note on her windshield that was "written in the same style as an email," and she believed it was signed by Seyed. The letter stated, "Welcome back to LA my love! [¶] I'm so proud of you for what you have achieved so far and I'm glad that you are enjoying the [car] I bought for you. [¶] Life is too short my favorite one and we shouldn't waste any more time. [¶] Let me know when [you're] available to chat perhaps in a nice restaurant of your choice in [your] area. [¶] Dad." Michelle believed the only way Seyed could have known her address was if he followed her home from work.

Michelle filed a police report and applied for a TRO the next day. The following week Michelle received in the mail at her business address a copy of the same note that had been left on her windshield. Michelle testified, "I immediately felt terrified and violated that someone had trespassed into my gated garage to leave this note on my car letting me know they know where I live . . . . That it was unwanted harassment and intimidation."

2.      *Seyed's testimony*

Seyed testified that, prior to 2018, he had limited contact with Michelle but believed there was an "open channel" between them. He denied that Michelle conditioned her acceptance of the car in 2016 on Seyed having no further contact. Seyed also denied that Michelle ever told him not to contact her prior to his sending the May 5, 2021 email. But Seyed admitted that in 2020 his then-girlfriend mailed Michelle a souvenir he had purchased from a trip, and Michelle responded by asking him not to let his girlfriend send her things.[11]

---

[11]     The record contains a copy of a December 2016 email message sent to Seyed that states, "When my mom asked you to stop sending

9

Seyed admitted he emailed Michelle in May 2021. He stated he had not been in contact with her for over a year and wanted to wish her a happy birthday. But, consistent with his declaration, Seyed denied contacting Michelle again after receiving her response. With respect to the unsigned note Michelle testified was left on her car on July 29, 2021, Seyed testified he never signed communications to Michelle with "Dad," instead signing them "daddy," "Hamid," or his nickname "Mehran."

### 3. *Expert testimony*

Michelle's attorneys called Linda Mitchell, a forensic document examiner, as a handwriting expert. Mitchell testified Rahimi provided her with a bound journal, which Rahimi represented had belonged to Sayed. Mitchell confirmed that she had no other way of knowing that the journal was from Seyed. Mitchell compared the handwriting in the journal to the handwriting on the envelope Michelle received in August 2021 containing the note allegedly from Seyed. Mitchell concluded the handwriting samples were "probably" from the same person because they contained "significant similarities." She added with respect to handwriting samples from Seyed, Michelle, and Rahimi that "[t]here are some similarities between the envelope and all three writers. But those can be familial. They can be happenstance or they can be not significant similarities . . . ."

Seyed's attorneys called Beth Chrisman, also a forensic document examiner, as a handwriting expert. Chrisman analyzed

---

me gifts, that doesn't mean have Patricia send me things. That is very inappropriate and she has no business sending me anything. If you would like to send me anything, check with my mother first since she has always been and always will be closest to me."

the handwriting on the envelope Michelle received and compared it to five samples of Seyed's handwriting. She noted the samples of Seyed's handwriting all had a unique "A" formation, but the envelope did not. Chrisman explained, "I found that the letter spacing, the letter connections, the fluidity of the writing and the letter formations as well as the habits between letters was inconsistent with that of Mr. Razavi's handwriting." Chrisman opined "to a reasonable degree of scientific certainty" that Seyed "did not write the address on the envelope in question."

Chrisman also compared the envelope to the documents Michelle filed in connection with her request for a TRO and that Rahimi filed in Orange County in support of her request for a TRO. Chrisman opined "there is a probability" that the person who wrote the envelope filled out the information in the two requests for TRO's.

4.   *Closing arguments and the family court's ruling*

At the final hearing on August 17, 2022, the family court stated prior to closing arguments that "regardless of what the ruling is, [Michelle] is requesting no contact and that will be respected on a go forward basis, because otherwise it's to disturb the peace." Further, "no contact really means no contact, and so regardless of what the ruling is, there will be no contact because I think she's entitled . . . ."

In her closing argument, Michelle's attorney asserted that Michelle had testified credibly to abuse by Seyed, including Seyed's emails to Michelle after she requested he not contact her. The attorney concluded, "If your honor refuses or denies this request for a restraining order, you're giving this man license to continue hounding my client, a person who wants to be done with him." The

attorney for Seyed argued in response that there was no basis for finding that Seyed had disturbed Michelle's peace.

The court took the matter under submission, and later that day the court issued a written ruling denying Michelle's request for a DVRO. The court explained, "The Court, after considering the credibility of the parties and witnesses and the admissible evidence, finds that [Michelle] has not met her evidentiary burden of showing she is entitled to a ROAH.[12] The evidence does not establish that [Seyed] disturbed the peace of [Michelle] or otherwise committed recent acts that would warrant a ROAH. [Michelle's] application is therefore denied and the prior temporary restraining order dissolved."

Michelle timely appealed.

## DISCUSSION

A. *Governing Law and Standard of Review*

Pursuant to the Domestic Violence Prevention Act (DVPA; § 6200 et seq.), a court may issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.'" (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782; accord, § 6300.)

The DVPA defines domestic violence, as relevant here, as abuse perpetrated against a child of a party. (§ 6211, subd. (e).) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Abuse includes "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" or "engag[ing] in any behavior that has been

---

[12]    A ROAH is a "restraining order after hearing."

12

or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(3), (4).) Conduct that may be enjoined under section 6320, subdivision (a), includes "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ." (See *Hogue v. Hogue* (2017) 16 Cal.App.5th 833, 839.) "'[D]isturbing the peace'" of the other party "refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).)

"The party seeking a restraining order bears the burden of establishing the circumstances justifying the order." (*Jan F. v. Natalie F.* (2023) 96 Cal.App.5th 583, 593; accord, *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 14.) The DVPA requires proof of past abuse by a preponderance of the evidence. (*Curcio*, at p. 14; *In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226.) We review the grant or denial of a request for a DVRO for an abuse of discretion. (*Davila and Mejia,* at p. 226; *In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424.) We likewise review the family court's failure to consider evidence in issuing a DVRO for an abuse of discretion. (See *Nevarez v. Tonna, supra*, 227 Cal.App.4th at p. 785 [family court did not abuse its discretion in refusing to consider text messages before issuing DVRO].)

Generally, "'"[t]o the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review."'" (*In re Marriage of Davila and Mejia*, at p. 226; accord, *In re Marriage of G.*, 11 Cal.App.5th at p. 780.)

13

However, "'[i]n a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment [or order]." [Citations.] Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law*." [Citation.] Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"' [Citation.] This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing [party] to meet, because unless the trier of fact made specific factual findings in favor of the losing [party], we presume the trier of fact concluded that '[the party's] evidence lacks sufficient weight and credibility to carry the burden of proof.'" (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651; accord, *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 979.)

B.      *The Family Court Did Not Abuse Its Discretion in Denying Michelle's Request for a DVRO*
        1.      *The family court applied the correct legal standard*
        Michelle contends the family court applied the wrong legal standard in finding she failed to meet her burden of proof for issuance of a DVRO. Specifically, she argues the court in its August 17, 2022 minute order applied the standard for a restraining order after hearing (ROAH), which requires proof of "threatening behavior," instead of the standard for a restraining order under the DVPA, which requires only a showing of past abuse.

14

Michelle fails to cite to any authority for her assertion that a restraining order after hearing requires a showing of threatening conduct. The family court stated in its August 17 minute order that Michelle did not meet "her evidentiary burden of showing she [was] entitled to a ROAH. The evidence does not establish that [Seyed] disturbed the peace of [Michelle] or otherwise committed recent acts that would warrant a ROAH." Given the court's reference to the lack of evidence that Seyed disturbed Michelle's peace of mind or committed recent abuse, it is clear the court was referring to the standard for issuance of a DVRO. (See §§ 6218, subd. (a) [court may enjoin acts of abuse], 6320, subd. (a) [abuse under DVPA includes "disturbing the peace of the other party"].) Although we recognize use of the term "ROAH" in the context of a DVRO may have created some confusion, and we discourage courts from using an unfamiliar acronym in the DVRO setting, we interpret the court's use of the term here to mean that its ruling in issuing a restraining order under the DVPA was made after a hearing (and was not a temporary restraining order).

2. *Michelle's evidence did not compel a finding of abuse as a matter of law*

Michelle, in arguing Seyed's conduct constituted abuse, points to Seyed's purported violations of the TRO and that Seyed disturbed her peace by leaving the note on her car on July 29, 2021. Michelle has not met her burden to show this evidence compelled a finding of abuse.

Michelle asserts Seyed violated the TRO on August 28, 2021 by contacting Rahimi and threatening to harm Michelle if she did not withdraw her request for a DVRO. Michelle is correct that a violation of a TRO may constitute abuse under the DVPA. (See *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602 ["Section 6203, subdivision (a)(4) specifically provides that engaging in behavior

15

that has been enjoined pursuant to section 6320 constitutes abuse for purposes of the DVPA."].)  However, the court only has jurisdiction over a person to be restrained after proper service. (*Caldwell v. Coppola* (1990) 219 Cal.App.3d 859, 863.)  Therefore, Seyed could not have violated the TRO in August 2021 because he was not served with the TRO until November 30, 2021, three months after the alleged threat by Seyed.

With respect to the handwritten note left on Michelle's car on July 29, 2021, the note was never produced at the hearing, but Michelle produced a typewritten note that she testified had the same text as the handwritten note.  As discussed, this note, signed by "Dad," stated the author was proud of Michelle's achievements and added, "Life is too short my favorite one and we shouldn't waste any more time."  The note invited Michelle "to chat" in a nice restaurant of her choosing.  Even assuming from Michelle's testimony that the note disturbed her peace (based on her testimony that she was terrified and felt violated that someone had entered her gated garage to leave the note), there was conflicting evidence as to whether Seyed sent the note.  Seyed denied that he left a note on her car, explaining he did not know Michelle's address and had never signed his communications with Michelle as "Dad," instead signing as "Hamid" (like the May 5, 2021 email), "daddy," or "Mehran."

Further, the experts disagreed on whether Seyed addressed the envelope with the August 2021 typewritten note.  As the family court explained in its written ruling, it considered the credibility of the parties and witnesses, as well as the admissible evidence. Mitchell's testimony depended in part on whether Seyed had written the journal Rahimi provided to Mitchell as a sample of Seyed's writing, and Mitchell opined only that the handwriting was "probably" from the same person.  By contrast, Chrisman compared

16

the handwriting on the envelope to five samples of Seyed's handwriting and concluded to a reasonable degree of scientific certainty that the handwriting on the envelope did not match Seyed's handwriting. She also stated "there is a probability" that the person who wrote the envelope filled out the information in Michelle's request for a DVRO and Rahimi's request for a DVRO in the Orange County dissolution proceeding. Given the court's finding that Michelle had not met her burden to show past abuse, we imply a finding that the court found Seyed and Chrisman more credible than Michelle and Mitchell. We defer to the family court's credibility findings and do not reweigh the evidence. (*Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 223 ["It was for the trial court to weigh the evidence and consider the demeanor and credibility of the witness, as 'credibility issues [are] routinely resolved by [the] trier[ ] of fact.'"]; *In re Marriage of Evilsizor & Sweeney, supra,* 237 Cal.App.4th at p. 1426 ["the trial court was in the best position to evaluate credibility and to resolve factual disputes"].)

Michelle's testimony that she felt violated by Seyed's May 5, 2021 email wishing her a happy birthday fares no better. Although it was clear from Michelle's profane response that she did not want to have any future contact with Seyed, Seyed testified that this was the first time Michelle told him that she did not want any contact, pointing to his communications with Michelle in 2016 about his gift of a car. Further, the family court assessed Michelle's credibility, and we imply a finding that the happy birthday email did not disturb her peace. As discussed, we defer to the family court's credibility findings. It was likewise the court's role to assess the parties' credibility with respect to whether on July 26, 2021 Seyed drove by Michelle when she was leaving the fitness center: Michelle stated Seyed drove by; Seyed testified he was not in Los Angeles at the time.

17

Michelle also contends the family court abused its discretion in refusing to consider her January 19 and March 25, 2022 declarations, which she asserts attached "hundreds of pages" of evidence. However, the appellate record does not contain a January 19, 2022 declaration, and Michelle has failed to point to anything in the March 25 declaration that was not included in Michelle's September 16, 2021 declaration, which the court admitted, or in Michelle's testimony at the hearing. Further, the exhibits to the March 25 declaration were either duplicative of evidence already in the record (such as Seyed's May 2021 email to Michelle and the letter Michelle received at her work address in August 2021) or were not relevant to the proceeding (such as documents regarding other legal proceedings involving Seyed, information regarding Seyed's business activities, and emails between Michelle and Seyed's counsel). On appeal, "'"the appellant bears the burden of providing an adequate record affirmatively proving error."'" (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 996; accord, *Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970.) Michelle has not pointed to anything in the record that shows the court abused its discretion.

Moreover, the family court allowed Michelle to testify to each alleged instance of abuse by Seyed in the prior 12 years (since 2009). Relying on *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 823, Michelle argues the court abused its discretion in excluding testimony about conduct prior to 2009. In *Rodriguez*, the Court of Appeal concluded the family court erred in finding abuse that had occurred six months before the hearing was too remote in time to be the basis for a restraining order. (*Ibid*.) *Rodriguez* does not support the proposition that 12-year-old conduct is necessarily relevant to current abuse. Moreover, as the court observed, the evidence Michelle sought to present was offered to show what led

18

up to Michelle's desire to avoid contact with Seyed, not the abuse supporting the DVRO. Thus, exclusion of this testimony was not an abuse of discretion.

Michelle also asserts that the family court abused its discretion in excluding testimony from Rahimi and Michael. With respect to Rahimi, Michelle's attorney argued Rahimi would testify about Seyed's purchase of the car for Michelle in 2016, the deterioration of the relationship between Michelle and Seyed, and Seyed's prior abuse (before the 2021 incidents). As the court found, this testimony was cumulative and did not assist the court in determining whether there was abuse. Michelle's attorney also asserted that Rahimi would testify it was Seyed's handwriting on the envelope, but this too was cumulative of the evidence from Mitchell. As to Michael, Michelle's attorney stated he was a percipient witness to the relationship between Michelle and Seyed and could testify about physical and verbal abuse by Seyed growing up. He also would corroborate that Michelle asked Seyed not to contact her. The court responded that Michelle had already established these facts through her direct testimony. The attorney did not object further, instead concluding, "If your honor believes that it's unnecessary, we can move on." On these facts, there was no abuse of discretion. (See *Nevarez v. Tonna, supra*, 227 Cal.App.4th at p. 785 [family court did not abuse its discretion by refusing to consider text messages offered by petitioner because they were cumulative of witness's direct testimony].)

In light of the conflicting evidence that Seyed had disturbed Michelle's peace or "mental or emotional calm" (See § 6320, subd. (c)), Michelle has not met her burden on appeal to show the evidence compelled a finding of past abuse. Accordingly, the family court did not abuse its discretion in denying the DVRO. (*Estes v. Eaton Corp., supra*, 51 Cal.App.5th at p. 651.)

19

C. *The Family Court Did Not Violate Michelle's Due Process Rights by Showing Bias in Favor of Seyed's Attorney*

Michelle contends the family court violated her due process rights by displaying bias in favor of Seyed and his attorney before and during the DVRO hearing. She has not shown bias.

Michelle points to the fact that at the beginning of the DVRO hearing, the family court greeted Seyed's attorney, stating, "Good morning, Ms. Lozoya . . . . Nice to see you." Michelle also contends the family court improperly made up its mind at the end of the April 4, 2022 hearing by explaining that it planned to wait until after Michelle's birthday to file its final decision. The fact the court politely greeted an attorney does not mean the court was biased against the opposing party or attorney. With respect to Michelle's birthday, when the parties were discussing the scheduling of Seyed's testimony, Michelle raised that she preferred not to be in court on her birthday. The court responded that it did not want to require her to be present on her birthday, and it set the hearing for the day before her birthday. In this context the court noted that it would likely rule after Michelle's birthday, adding, "I don't know which way the ruling is going to be." In light of this record, it would be pure speculation to conclude the court had already decided to rule in Seyed's favor (as opposed to accommodating Michelle's schedule).[13]

---

[13] Michelle also argues in her opening brief that the family court made clear it planned to rule in Seyed's favor by stating, "I don't want any commotion when I'll make my ruling today." However, this comment does not appear on the page cited by Michelle in her opening brief, and she does not address it again in her reply. In any event, nothing about the comment suggested that the court had decided to rule in Seyed's favor.

Michelle also contends the family court showed bias on January 19, 2022 by sustaining many of Seyed's evidentiary objections, while declining to admit Michelle's evidence. However, as discussed, on April 4, 2022 the court made clear that it had considered Michelle's September 16, 2021 declaration, subject to Seyed's evidentiary objections.[14] The fact the court made evidentiary findings in favor of Seyed does not alone support a finding of bias. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1206 [rejecting bias claim where record did not show the trial court based its decisions on "anything but the evidence properly presented at trial"]; *Blakemore v. Superior Ct.* (2005) 129 Cal.App.4th 36, 60 [trial court's three erroneous rulings did not support bias claim where plaintiffs "can point to nothing in the transcript of the hearings or elsewhere reflecting comments or conduct by the trial judge that suggests any bias in favor of [defendant] or against the . . . plaintiffs"].)[15] Moreover, the family court allowed Michelle to testify about each act of alleged abuse by Seyed on which she based her request for a DVRO, and to present expert testimony on

---

[14] Recognizing the confusion in the record, the family court explained in its minute order denying the DVRO that it was considering the admissible portions of the "undated Declaration" that Michelle "lodged in support of her application for . . . alternate service. The Declaration consisted of 8 typed pages and 29 separate paragraphs and provided a detailed history of [Michelle's] issues with her Father." This description matches the September 16, 2021 declaration.

[15] Michelle also argued the family court ruled on Seyed's evidentiary objections before considering Michelle's response. However, Michelle filed her response on January 19, 2022, and the court made clear at the January 19 hearing that it had considered her response before ruling on the evidentiary objections the same day.

21

whether Seyed's handwriting was on the envelope containing the July 29, 2021 note she claimed Seyed left on her car.

Michelle's contention that the family court showed bias by refusing to file her January 27, 2022 motion for reconsideration is not supported by the record. The only evidence of a motion for reconsideration is a copy of a January 28, 2022 email Michelle sent to the family court's clerk and Seyed's counsel stating Michelle "hereby does move for an order" reconsidering the January 19, 2022 ruling and attaching a five-page motion for reconsideration. However, Michelle has not pointed to any evidence that she attempted to file the motion or obtain a hearing date or that the judge had any role in refusing to allow the document to be filed.

We also note that at no time did Michelle or her attorney raise a concern about the family court's bias or file a motion to disqualify the judge, making her challenge on appeal untimely. (See Code Civ. Proc., § 170.3, subd. (c)(1) [a statement seeking a judge's disqualification "shall be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification"]; *People v. Johnson* (2015) 60 Cal.4th 966, 978-979 ["'Defendant may not go to trial before a judge and gamble on a favorable result, and then assert for the first time on appeal that the judge was biased.'"].)

## DISPOSITION

The order denying Michelle's request for a DVRO is affirmed. Seyed is to recover his costs on appeal.

FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.